UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY REAVES, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | *   Civil Action No. 1:16-cv-10169-IT |
| | * |
| OSVALDO VIDAL, | * |
| | * |
| Respondent. | * |

                         MEMORANDUM & ORDER

                          December 31, 2019

I.   Introduction

   Before the court is Petitioner Timothy Reaves' Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus ("Petition") [#1]. Petitioner is serving a life sentence in state custody. Respondent Osvaldo Vidal's Opposition to Petitioner's Petition for Writ of Habeas Corpus ("Resp't's Mem. Opp'n.") [#37] contends that the claims Petitioner asserted in his Memorandum in Support of the the Petition ("Pet'r's Mem.") [#36] were reviewed and denied on procedural grounds at the state level. Petitioner has filed a Memorandum in Response ("Pet'r's Suppl. Resp.") [#40] in which he contends that there is cause for and prejudice from the procedural default such that the claims should not be barred. For reasons discussed below, the Petition [#1] is DENIED on grounds of procedural default.

II.  Factual & Procedural History

   In 1996, Petitioner was convicted of murder in the first-degree under a theory of joint venture for the drive-by shooting of fourteen-year-old Daniel Correia. Pet. 1 [#1];

Commonwealth v. Reaves, 434 Mass. 383, 389 (2001).[1] Petitioner was sentenced to life without the possibility of parole. Pet. 1 [#1]. The Massachusetts Supreme Judicial Court's ("SJC") account of the facts that could be found from evidence presented at trial, as presently relevant, follows:

> At around 3 P.M. on April 15, 1994, [Reaves] and three companions (Scott Rose, Richard Hazard, and Michael Coull) came to Magnet Park in New Bedford to buy drugs. They approached Joseph Correia (the brother of the victim), and Rose asked Correia if he had a "bundle of dope [heroin]." Correia said that he did. However, when [Reaves] pulled out some money to proceed with the transaction, Correia snatched the money from [Reaves'] hands and told him "there ain't no drugs around here, you got beat for your money."
>
> During this exchange, three of Correia's companions came over, one of whom (Landon Arnum) was acquainted with [Reaves]. [Reaves], apparently offended by Correia's treatment, told Arnum, "Tell this kid [Correia] who I am. I'm from the old school." Other witnesses recalled more remarks in a similar vein ("Stop trying to play me." "Tell them I'm not to be fucked with." "I ain't no joke"). One of Correia's friends then advised Correia to give [Reaves] his money back, observing that [Reaves] was probably unaware of the efforts to end drug selling in the park. Correia handed the money back.
>
> This gesture did not mollify [Reaves]. He pulled out more money and said, "If you want to beat me, beat me right." [Reaves] then began arguing with another of Correia's companions, Shane Arnum. The argument ended abruptly when Shane Arnum punched [Reaves] in the jaw, knocking him unconscious. . . .
>
> . . . .
>
> Scott Rose then picked up [Reaves], carried him to [Rose's] car, and placed him in the back seat, still unconscious. Rose threatened, "We'll be back to spray it up." He was also heard asking the others, "Who got the strap [gun]?" Landon Arnum testified that he saw [Reaves] "coming through" as the four prepared to leave. As they left, the men in the car, including [Reaves], repeated the threat, "We'll be back."
>
> Two hours later, [Reaves], Rose, Coull, and Hazard arrived at the home of Patricia Chaney and William Watson in Taunton, some twenty-five miles away . . . . When Watson arrived, Rose met him in the driveway and said, "I need a

---

[1] Co-defendants Scott Rose and Richard Hazard were tried separately from Reaves and were convicted of murder in the second degree, while co-defendant Michael Coull pleaded guilty to manslaughter. Reaves, 434 Mass. at 389 (citing Commonwealth v. Rose, 47 Mass. App. Ct. 168-69 (1999)).

favor." [Reaves], whose face was still bloodied from the earlier blow, went to the bathroom to clean up. Rose and Watson proceeded into the parlor, at which point Rose told Watson, "I need one of your guns. All of my boys are packing and I don't have one." . . . .

Patricia Chaney testified that [Reaves] and Coull soon joined the others in the parlor, and that all four men were in the parlor with William Watson for ten to fifteen minutes. . . . A short while later, [Chaney] saw the four men emerge from the parlor with the gun. They concealed the weapon in a plastic trash bag and left the house carrying the concealed shotgun.

Around 7 P.M. that evening, [Reaves], Rose, Coull, and Hazard returned to Magnet Park in Rose's car. Rose was driving. Hazard was in the front passenger seat with the shotgun. Coull was sitting behind the driver, and [Reaves] was sitting behind Hazard. The two in the front had bandanas pulled over their faces. The men in the back seat wore sunglasses and caps.

Many people were still outside in front of the housing development adjacent to the park, including Joseph Correia and the companions who had been with him during the confrontation earlier that afternoon. Correia was sitting on the hood of a parked car. His younger brother, Daniel Correia, was sitting on the trunk of the same car.

As Rose drove up the street toward Joseph Correia's group, gunshots rang out from the car. Two weapons were firing, one out the front driver's side window and another out the rear driver's side window. As Joseph Correia ducked behind the parked car, he was shot in the leg. Another shot hit Daniel Correia, who fell to the ground. Other shots were fired in the general direction of the housing development striking a car, a door, and windows as high as the third floor. Joseph and Daniel Correia were the only two people hit. Daniel died shortly thereafter of a single bullet wound through the heart.

The car carrying the gunmen sped from the scene, but was followed by a man on a motorcycle. Specific information about the car, including its whereabouts and direction, were soon relayed to the police. As police cars came into view of Rose's vehicle, the driver in the car behind Rose saw a black object thrown out one of the passenger side windows. The witness later brought police back to the spot, where they retrieved a nine millimeter handgun. A ballistics expert opined that the bullet taken from Daniel Correia's body had been fired from that same handgun. Rose led police on a chase with speeds in excess of one hundred miles an hour, breaking through a police roadblock in Taunton. The chase ended when Rose's vehicle crashed into another car. Hazard got out of the front passenger side and attempted to flee on foot. Rose was slumped over the steering wheel. Coull had been ejected part way out the rear driver's side window. [Reaves] was in the rear passenger seat, having suffered a spinal fracture. As police came upon the accident scene immediately following the crash, an officer saw a shotgun thrown

out a passenger side window. The shotgun was later identified as the one Rose
had borrowed from William Watson earlier that evening.

Reaves, 434 Mass. at 384–87 (footnotes omitted). In a footnote, the SJC stated further:

> [Reaves] was removed from the car by police and taken to the hospital. According
> to the police officer who saw him at the hospital, and according to the medical
> records, [Reaves] was still moving his arms at that time. He was unable to move
> his legs. The accident has rendered [Reaves] quadriplegic, with no use of his legs
> and limited use of the triceps and biceps muscles in his arms.

Id. at 387, n.8.

On direct appeal, Petitioner raised several arguments, including that there was insufficient evidence of his mental state to convict him on a theory of joint venture. In 2001, the SJC affirmed his conviction. Id. at 384. On the argument regarding evidence of intent, the SJC concluded:

> There was . . . sufficient evidence from which the jury could infer that the
> defendant shared the intent to kill in retaliation for his earlier humiliation, and that
> he deliberately premediated the killing. . . .
>
> Here, the evidence established [Reaves'] presence at and awareness of Rose's
> acquisition of a gun for the stated purpose of a retaliatory shooting. While Rose's
> initial request for the gun was made outside [Reaves'] hearing, the evidence
> showed that [Reaves] was with Rose, Hazard, and Coull for some ten to fifteen
> minutes with the shotgun in plain sight on the couch. The jury could infer that the
> general subject matter of Rose's need for the gun (which was the entire purpose of
> his twenty-five mile trip to Watson's home) continued to be discussed as his other
> companions joined him in Watson's living room. [Reaves] was also aware that
> Rose took the gun with him. The jury thus had ample evidence of [Reaves']
> involvement in the planning of the shooting.
>
> [Reaves'] argument on this point also ignores the fact that [Reaves] himself
> was the very purpose of this retaliatory venture. The jury could reasonably infer
> that [Reaves'] three companions, who had been with him when he was knocked
> out, with him at Watson's house, and with him throughout the shooting itself,
> would include him in their vengeful plan to shoot the people who had offended
> him earlier that afternoon. [Reaves] himself had exhibited outrage when his
> attempt to buy drugs was rebuffed and his money snatched. [Reaves'] indignation
> at being knocked unconscious with a single blow would, when he regained
> consciousness, surely be even greater. There was evidence that [Reaves] was
> regaining consciousness, and would thus have overheard the initial threats made

4

by his companions as they left the scene of the original confrontation, and that [Reaves] himself joined them in announcing, "We'll be back." Such evidence of prior hostility supports an inference of malice. . . . The jury could thus infer that the defendant had the requisite mental state for deliberately premeditated murder with malice aforethought.

Id. at 392–93 (footnotes omitted).

In 2010, Petitioner, proceeding *pro se*, filed two motions in Superior Court. In his Rule 30 Motion for a New Trial, he argued, among other contentions, that he did not have the requisite state of mind for the crime of conviction because of brain damage from the blow he received earlier that day and the effects of his intoxication from alcohol and smoking marijuana "laced with P.C.P. (angel dust)," and that his trial counsel's failure to introduce expert testimony as to his inability to form intent amounted to ineffective assistance of counsel. Mot. for New Trial 16-17 [#36-1]. In his Motion to Dismiss Grand Jury Indictment, he asserted additional arguments, including that the prosecutor at his trial had operated under conflict of interest because he had served as Reaves' defense counsel in a prior proceeding. Mot. to Dismiss Grand Jury Indictment 33 [#36-1].

In July 2010, the original trial judge denied the Rule 30 Motion for a New Trial. Pet. 3 [#1]; Mem. of Decision & Order on Def.'s Mot. for New Trial, Attach. B to Pet'r's Mem. [#36-2]. On the ineffective assistance of counsel claim, the trial judge concluded that "[a] new trial is not needed based on Reaves's trial counsel's reasonable decision not to connect evidence of Reaves's purported brain damage and intoxication . . . (purportedly from alcohol and marijuana) with an argument relating to Reaves's intent on the day of the murder." Id. at 8.

The record here contains no ruling on the Motion to Dismiss Grand Jury Indictment, where Reaves raised the conflict of interest of the prosecutor.[2]

---

[2] Petitioner contends that the conflict of interest argument was included in the Rule 30 Motion for New Trial, and that the state court failed to address it in connection with that motion. Mem.

5

In 2015, Petitioner filed an application under Mass. Gen. Laws ch. 278, § 33E for leave to appeal the denial of the motion for new trial. On September 21, 2015, his 33E Petition was denied as untimely, and as not presenting a new and substantial issue. Pet'r's Mem., Attach. D, Order on Def.'s Pet. for Leave to Appeal Pursuant to Mass. Gen. Laws ch. 278, § 33E and Mot. for Appointment of Counsel ("33E Petition") [#36-4].[3]

Petitioner filed the instant Petition [#1] *pro se* on January 25, 2016. Pet. 1 [#1]. Respondent sought to dismiss the Petition as time-barred. Resp't's Mot. to Dismiss [#9]. Following briefing by court-appointed counsel, the court found that the Petitioner's severe physical disabilities and lack of access to legal resources presented "extraordinary circumstances" that warranted equitable tolling, and denied the motion. Mem. & Order on Mot. to Dismiss [#30].

In the Memorandum in Support of the Petition [#36], Petitioner asserts two grounds for relief: (1) ineffective assistance of counsel, with respect to trial counsel's failure to adequately address whether Petitioner was capable of forming intent with respect to the first-degree murder conviction; and (2) denial of due process due to the trial prosecutor's representation of Petitioner in a prior criminal matter. Pet'r's Mem. 4-13 [#36].[4]

---

at 12 [#36]. Although Attachment A to Mem. [#36-1] is filed here as a single document, it consists of two separate motions. See Cover Letter [#36-1] at 1 (asking the clerk to forward a copy of the enclosed "motions"); Caption of Rule 30 Motion, Attach. A to Mem. 3 [#36-1]; Caption of Motion to Dismiss Grand Jury Indictment, Attach. A to Mem. 20 [#36-1].

[3] The Single Justice also denied Petitioner's motion to appoint counsel.

[4] The Petition [#1] asserted three additional grounds for habeas relief: (1) insufficient evidence for the grand jury to reach the indictment; (2) impermissible burden shifting in the jury instructions; and (3) ineffective assistance of appellate counsel. Pet. at 6-12 [#1]. These grounds were not discussed in the Memorandum in Support of the Petition [#36], and Petitioner raised no objection to Respondent's contention that these grounds were waived. See Resp't's Mem. Opp'n. 3, n.1 [#37]. The court treats these grounds as waived. See Lamartine v. Ryan, 215 F.Supp.3d 189, 193-94 (D. Mass. 2016) ("A petitioner's failure to explain the rationale and support for his

6

Respondent filed an Opposition [#37] arguing the two claims identified in Petitioner's memorandum are procedurally defaulted because these claims were denied on procedural grounds at the state level. Resp't's Mem. Opp'n. 3 [#37]. In order to frame the issues raised by Respondent, the court starts first with the exhaustion requirement for habeas review and the standards for procedural default, and then turns to Petitioner's contentions as to each claim raised here and his assertion that there was cause and prejudice to excuse the procedural default.

III.   Habeas Review – Exhaustion and Procedural Default

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus will not be granted on behalf of a person in custody pursuant to the judgment of a state court "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Exhaustion requires a petitioner to present, or do his best to present, the substance of a federal habeas claim "fairly and recognizably" to the state's highest tribunal prior to seeking habeas relief. Adelson v. DiPaola, 131 F.3d 259, 262 (1st Cir. 1997). This principle reflects the "doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter." Rose v. Lundy, 455 U.S. 509, 518 (1982) (internal quotations omitted).

Federal courts considering a § 2254 habeas petition also generally do not review state court decisions that rest on "independent and adequate state grounds." Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir. 1999) (citing Trest v. Cain, 522 U.S. 87, 89 (1997)). "Independent and

---

entitlement to habeas on a particular ground in his memorandum can result in waiver of that claim.")

adequate grounds exist where the state court declined to hear the federal claims because the [petitioner] failed to meet a state procedural requirement." Simpson, 175 F.3d at 206 (internal quotation omitted).

In Massachusetts, when a defendant appeals a first-degree murder conviction to the SJC, "the whole case" is transferred to that court "for its consideration of the law and the evidence." Mass. Gen. Laws ch. 278, § 33E. Although "the preferred method for raising a claim of ineffective assistance of counsel is through a motion for a new trial" (with a limited exception for circumstances where "the factual basis of the claim appears indisputably on the trial record"), Commonwealth v. Zinser, 446 Mass. 807, 810-11 (2006), a motion for a new trial filed while a direct appeal of a first-degree murder conviction is before the SJC is presented directly to the SJC. Mass. Gen. Laws ch. 278, § 33E. Such a motion "shall be dealt with by the full court, which may itself hear and determine such motions or remit the same to the trial judge for hearing and determination." Id.[5]

A defendant may also file motions for new trial after the initial plenary review. In that event, however, a defendant is only entitled to review of the denial of such a motion for a new trial if he obtains consent from a Single Justice of the SJC who serves as a "gatekeeper." Lee v. Corsini, 777 F.3d 46, 52 (1st Cir. 2015). See also Mass. Gen. Laws ch. 278, § 33E; Commonwealth v. Francis, 411 Mass. 579, 583 (1992). To be allowed to proceed under these circumstances, the petition must present a "new and substantial" issue. Costa v. Hall, 673 F.3d 16, 19 (1st Cir. 2012).

---

[5] If such a motion is remanded by the SJC to the Superior Court, "the direct appeal of the conviction will ordinarily be stayed until the motion is decided." Mass. R. App. P. 19(c)(2).

When a petition is denied by the Single Justice, and the "issues . . . sought to be raised in the § 33E petition include[] essentially the same issues sought to be raised by the federal habeas petition," the Single Justice's denial is an independent and adequate state ground that bars the district court's review of those issues. Simpson, 175 F.3d at 206. Even where the Single Justice has examined the merits of Petitioner's claim to determine whether the claims presented were "new and substantial," this "does not convert [the Single Justice's] decision into one on the merits." Costa, 673 F.3d at 24; see also Mendes v. Brady, 656 F.3d 126 (1st Cir. 2011) (finding although the "gatekeeper judge[] reference[d] [] the merits . . . [he] was not ruling on the merits . . . instead, he was simply addressing the second prong of the new-and-substantial rule . . . ."); Lee, 777 F.3d at 57 ("[P]rocedurally defaulted claims cannot be resurrected by a single justice's holistic review of the merits in the context of a miscarriage-of-justice analysis.").

For a district court to consider the merits of claims otherwise procedurally defaulted, a petitioner must demonstrate both "cause for any state-court procedural default of federal claims, and prejudice therefrom." Costa, 673 F.3d at 23. To show cause, the petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," which "could include a showing that 'the factual or legal basis for a claim was not reasonably available to counsel,' or that there was 'some interference by officials.'" Id. at 25 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). Prejudice requires a petitioner to "demonstrate 'not merely that the errors . . . created the *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Costa, 673 F.3d at 26 (citing Murray, 477 U.S. at 494) (emphasis in original)); see also United States v. Frady, 456 U.S. 152, 168 (1982) (requiring a showing of "actual prejudice resulting from the errors of which [Petitioner] complains") (internal quotation

marks omitted). The petitioner can also overcome a procedural default bar by showing that failure to consider the federal claim will result in a fundamental miscarriage of justice, such as where a constitutional violation has resulted in the conviction of one who is actually innocent. See, e.g., Schlup v. Delo, 513 U.S. 298, 323 (1995).

IV. Cause

Although Reaves filed a direct appeal that was heard by the SJC, he did not include either the ineffective assistance of trial counsel claim or the due process claim based on the conflict from the prosecutor's prior representation. He also did not file a motion for new trial while his direct appeal was pending, which would have allowed for the SJC's review of this claim along with the direct appeal. Instead, he presented the ineffective-assistance claim in his post-appeal motion for a new trial and in another motion filed with the Superior Court, and five years later filed a 33E petition seeking review of the denial of the motion for a new trial. The Single Justice found the 33E petition untimely, and stated further that "in consideration of the merits of the petition . . . there is no new and substantial issue raised." 33E Petition [#36-4]. The Single Justice's finding that a petitioner has not raised a "new and substantial issue" for further review, see Costa, 673 F.3d at 23, and the Single Justice's finding that the 33E Petition was untimely both constitute findings of procedural default under state law. See Mains v. Commonwealth, 433 Mass. 30, 37 (2000) ("[I]n the interests of consistency and finality, we shall require that a gatekeeper petition pursuant to G.L. c. 278, § 33E, be filed within thirty days of the denial of a motion for a new trial."); see also Gunter v. Maloney, 291 F.3d 74, 79 (1st Cir. 2002) (stating that, to constitute an independent and adequate state ground, the SJC must "regularly and consistently enforce [a] procedural rule").

Petitioner asserts that he has cause for failing to timely file the 33E petition because the state itself is responsible for Petitioner's failure to access the court system during his incarceration where he lacks the ability to write without assistance. Pet'r's Suppl. Resp. 2 [#40]. He argues that the state comes with "unclean hands" because it restricted Petitioner's access to the court system, and that the state "impede[d] Mr. Reaves' access to its own court system" after state officials made complying with the state procedural rules "impracticable." Id. For the reasons set forth in this court's ruling on equitable tolling, see Mem. & Order on Mot. to Dismiss [#30], the court finds that Petitioner has demonstrated cause for the untimely petition to the Single Justice seeking to appeal the denial of the motion for a new trial.

Petitioner has not addressed, however, the Single Justice's further finding that Petitioner did not raise a new-and-substantial issue that would allow for a second appeal to the SJC. As framed here, Petitioner's arguments about the effect of his brain injury and intoxication and the prior representation of counsel would have been known to him at the time the appeal was pending. A claim is not "new" within the meaning of § 33E where it could have been addressed had the defendant properly raised it during the SJC's plenary review. See Costa, 673 F.3d at 23 (internal citation and quotation marks omitted).[6] While, as discussed further below, Petitioner can reasonably argue that his claim of ineffective assistance of counsel required a factual record beyond that at trial (thereby precluding direct appeal), he has offered no reason as to why a motion for a new trial, asserting ineffective assistance of counsel for failing to seek expert

---

[6] The result here (and in state court) may be different if Petitioner had argued new facts—such as new developments in scientific understanding of concussive syndrome and traumatic brain injury—not available at the time of his direct appeal. Petitioner makes no claim in his Rule 30 Motion for New Trial, his petition to the Single Justice, or here, however, as to any new facts.

11

testimony regarding brain damage and intoxication as it related to intent, could not have been presented to the SJC while his direct appeal was pending.

V. Prejudice

Even assuming that Petitioner could establish cause for not complying with the state court's procedural rules, Petitioner is also required to show prejudice to avoid procedural default. The court addresses each claim in turn.

A. Petitioner's Ineffective Assistance of Counsel Claim

"[I]f a habeas petitioner can meet the prejudice standard needed to establish ineffective assistance [of counsel] under Strickland, then the prejudice standard under the 'cause and prejudice' showing to excuse a procedural default is also met." Lynch v. Ficco, 438 F.3d 35, 49 (1st Cir. 2006) (citing Strickler v. Greene, 527 U.S. 263 (1999)). To make out a claim of ineffective assistance of counsel, under Strickland v. Washington, Petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness; and (2) that any deficiencies in counsel's performance resulted in prejudice to the defense. 466 U.S. 668, 688 (1984); see also Wiggins v. Smith, 539 U.S. 510, 521 (2003) ("We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.") (internal citations omitted).

On the face of Petitioner's allegations alone, his claim of ineffective assistance of counsel is plausible. Massachusetts recognizes evidence of intoxication as relevant to the question of intent, and a Massachusetts jury "may consider the question whether a defendant charged with murder in the first degree was so overcome by alcohol or some other drug that he was incapable of deliberate premeditation." Commonwealth v. Henson, 394 Mass. 584, 592 (1985); see also

Commonwealth v. Rose, 47 Mass. App. Ct. 168, 177 (1999) (finding that jury instructions were "compatible with the jury's job to consider credible evidence of the effects of the defendant's consumption of drugs [or alcohol] in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt.") (internal citation and quotation marks omitted). The effects of brain damage presumably would similarly factor into the capacity for deliberate premeditation. However, the standard requires Petitioner to show that "no competent lawyer" would have acted as his trial counsel did under the "particular facts of this case," and Petitioner has made no such showing. Lynch, 438 F.3d at 49 (internal citations and quotation marks omitted). Indeed, the SJC's holding that a motion for a new trial is the most appropriate time to raise an ineffective assistance of counsel claim responds to the SJC's recognition that many such claims are "of the sort requiring consideration of new facts" not available at trial, including assertions made in affidavits. Zinser, 446 Mass. at 812 (stating that "an ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight"). Petitioner has not provided any such "new facts," id., in either the record presented in the post-appeal proceedings in state court, nor in his habeas petition, and thus has failed to provide a sufficient basis for the court to conclude that Petitioner will suffer prejudice from his procedural default. Accordingly, even if Petitioner could present cause for his default, he has not established prejudice to excuse default of his ineffective assistance of counsel claim.

B.     Petitioner's Due Process Claim Based on Conflict of Interest[7]

Petitioner has likewise failed to show prejudice from default of his conflict of interest claim. Petitioner asserts that John Moses, the prosecutor on his case, represented him on charges of assault and battery from September 12, 1982, to January 3, 1983, eleven years prior to the shooting that precipitated the trial at issue. See Pet. 12 [#1]. Petitioner argues that Moses' prosecution of him is *per se* prejudicial and constitutes a structural error. Pet'r's Suppl. Mem. 5 [#40]. In this narrow context, the court disagrees. There are circumstances, such as "when, after representing a client, a lawyer joins in the criminal prosecution of that client *with respect to the identical matter about which the attorney originally counseled the client*" that the "confidentiality of the attorney-client relationship is severely compromised, if not destroyed." United States v. Schell, 775 F.2d 559, 565 (4th Cir. 1985); see also Commonwealth v. Watkins, 473 Mass. 222, 235 (2015) (finding that an "[a]n actual conflict of interest arises if a prosecutor has formerly represented a defendant in a matter that is substantially related to the pending case," but "[i]f a defendant establishes only a potential or tenuous conflict of interest, however, the conviction will not be set aside unless the defendant demonstrates that the conflict resulted in actual prejudice") (internal citations omitted).[8]

---

[7] Although the Petition [#1] does not describe Petitioner's prosecution by his former attorney as a due process violation, the court construes Petitioner as raising that argument in his memorandum and considers the claim in that context. See, e.g., United States v. Lilly, 983 F.2d 300, 309 (1st Cir. 1992) (applying a substantive due process analysis to appellant's claim that the prosecution acted under a conflict of interest).

[8] Petitioner cites to Wilkins v. Bowersox, 933 F. Supp. 1496 (W.D. Mo. 1996), aff'd on other grounds, 145 F.3d 1006 (8th Cir. 1008), cert. denied 525 U.S. 1094 (1999). In that death penalty case, the court found that the prosecutor, who had previously served as defendant's former defense attorney, had confidential information "of petitioner's psychological background through his former representation which resulted in commitment to a mental institution," and which the court found was "substantially related to the later prosecution," given that the prosecutor had "the discretion to seek or waive the death penalty, and that decision necessarily involved subjective assessments of petitioner's state of mind and mental health." Id. at 1523.

Absent such circumstances, courts determining the degree to which a defendant is prejudiced consider such factors as whether "(1) an actual attorney-client relationship existed between the moving party and the opposing counsel; (2) the present litigation involves a matter that is substantially related to the subject of the movant's prior representation; and (3) the interests of the opposing counsel's present client are materially adverse to the movant." United States v. LaVallee, 439 F.3d 670, 681 (10th Cir. 2006) (internal citations omitted); see also ABA Model Rules of Professional Conduct 1.9(b); United States v. Bolton, 905 F.2d 319, 321-22 (10th Cir. 1990) (affirming that trial court did not abuse its discretion in denying a motion to disqualify the prosecutor, who had previously represented the defendant, where there was no factual relationship between the two actions, and where the prosecutor was not aware of any confidential information relating to the instant case).

Under the circumstances here, Petitioner has failed to provide facts from which this court could find prejudice. There were no similarities between the legal issues of the assault and battery case in which Moses defended Reaves and the murder trial at issue, nor are there allegations of factual connections between the two matters. Although Petitioner asserts that Moses pressured Petitioner into pleading guilty in the 1983 case, Petitioner does not state how that impacted his case here, or what confidential information Moses may have learned. See, e.g., Watkins, 473 Mass. at 235-36 (finding no actual prejudice where prosecutor represented defendant in three charges, each ending "many years" before the murder case at hand, and unrelated to that matter).

C.  Conclusion

Petitioner's claims are procedurally defaulted, and Petitioner has not presented grounds to excuse the default. It is possible, given Petitioner's undisputed loss of consciousness after a head

trauma in the hours preceding the shooting for which he was convicted, that Petitioner may at some point be able to raise a claim in state court based on new developments in scientific understanding of concussive syndrome and traumatic brain injury. See, e.g., Commonwealth v. Epps, 474 Mass. 743, 768 (2016) (concluding that defendant convicted of assault and battery on a child based on evidence relating to "shaken baby syndrome" is entitled to new trial where "there is a substantial risk of a miscarriage of justice" because a defendant was deprived of a substantial defense "from the confluence of counsel's failure to find . . . an expert and . . . evolving scientific research"); see also Centers for Disease Control and Prevention, Traumatic Brain Injury & Concussion, What are the Potential Effects of TBI? (November 26, 2019), https://www.cdc.gov/traumaticbraininjury/outcomes.html. Such a claim, however, is not before this court and may not proceed here. For the foregoing reasons, the Petition [#1] is DENIED.

   IT IS SO ORDERED.

Date: December 31, 2019                 /s/ Indira Talwani
                                United States District Judge